UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT FOR ZAKARIA IBRAHIM | Case No. _____ <br><br> **UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Andrew E. Waltz, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a criminal complaint and an application for the issuance of an arrest warrant for ZAKARIA IBRAHIM.  IBRAHIM is a citizen of Egypt with a date of birth of XXX.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  I have set forth only the facts that I believe are necessary to establish probable cause to charge IBRAHIM with bribery of a public official in violation of 18 U.S.C. § 201.

2.      I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation (FBI).  I have been in this position since July 12, 2015.  My responsibilities include conducting or assisting with investigations involving public corruption, fraud, and other related violations of federal criminal law.  I am a graduate of the FBI Academy in Quantico, Virginia.  My training included instruction on investigative tools and criminal law, and I have become familiar with the investigative methods and enforcement of federal criminal violations. Based upon this experience, I have also become well versed in the methodology utilized in criminal conspiracies and activities. I have arrested numerous individuals for various

criminal violations and have spoken with numerous individuals regarding their criminal activities.

## PROBABLE CAUSE

3.      As described below, the evidence gathered in the course of this investigation establishes probable cause that IBRAHIM corruptly offered gave, offered, and promised things of value to a public official, namely a Revenue Officer of the District of Columbia Office of Tax and Revenue identified in this affidavit as CHS1, intending to influence CHS1 in the performance of an official act and intending to induce CHS1 to act in violation of her lawful duty.

## *BACKGROUND*

4.       OTR is responsible for collecting promptly the proper amount of tax from all persons who have not filed tax returns and/or paid tax as required by the District of Columbia, including but not limited to individual income taxes, business taxes, and an array of business-related fees and surcharges. For businesses, OTR determines the types of taxes that a company is responsible for filing based on completed business registration forms filed with OTR and the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"). DCRA's Corporations Division serves as the Office of Corporate Registrar for the District of Columbia. The Corporations Division registers all entities that conduct business in the District of Columbia.

5.      Businesses that must file sales and use taxes can file monthly, quarterly or annually. The filing frequency is determined by the amount of revenue generated by the business. For monthly sales and use taxpayers, the taxpayer files and pays a percentage of the gross sales. The percentage paid is determined by the type of sale. For example, food and alcohol served or prepared at restaurants are taxed at ten percent; therefore, ten percent of the gross receipts for the month are

remitted to the District of Columbia. The taxpayer prepares a return that reflects the gross receipts

and taxes due and remits the return and amount due by the 20th of the subsequent month.

6.      If the taxpayer files and pays the amount due on time, no further action is required.

If the taxpayer files and does not pay the amount due, the Integrated Tax System (ITS), a computer

database used by OTR to manage taxpayer accounts, automatically generates liability notices and

mails them to the taxpayer. If the taxpayer does not pay the balance after receiving several

(typically 2) liability notices from the ITS, OTR's Collections Division is notified of the

deficiency.

7.      After the Collections Division is notified of a deficiency, a Revenue Officer may

be assigned. Revenue Officers in the Collections Division are responsible for collecting delinquent

accounts and securing delinquent tax returns in accordance with OTR's guidelines. The assigned

Revenue Officer will make contact with the taxpayer by phone and/or in person to request payment

for the specific delinquent tax period identified in the liability notice. The Revenue Officer may

take graduated collection steps including but not limited to liens, levies, garnishments, and with

supervisory approval, payment agreements.

8.      IBRAHIM works as a self-employed expediter obtaining various permits and

licenses from the D.C. government for his clients.  The name of IBRAHIM's consulting business

is "IBRAHIM Consulting Service," located at 1050 Connecticut Avenue NW, Suite 500,

Washington DC 20009.  In connection with another investigation, IBRAHIM had previously

represented to investigators that he knows the "tricks" of being able to obtain documents from

D.C. government agencies because he used to "run illegal."

9.      Confidential Human Source ("CHS1") is a Revenue Officer in the Department of

Compliance Administration at OTR. CHS1 has been a Revenue Officer with OTR for numerous

years. CHS's roles and responsibilities as a Revenue Officer include ensuring a person or company is able to stay in compliance with OTR and ensuring they satisfy their tax obligations to the District of Columbia. CHS1 is authorized to negotiate Offers in Compromise[1], can negotiate payment arrangements, and can levy liens. CHS1 is also required to perform field work several times a week.

10.     Confidential Human Source ("CHS2") owns a business operating in the District of Columbia. The business is required to file sales and use taxes with OTR, in an amount as determined by the revenue of the business.

11.     On July 16, 2018, CHS1 conducted a consensually monitored telephone call with IBRAHIM in which IBRAHIM used phone number 240-383-7992.[2] CHS1 introduced themselves to IBRAHIM as a Revenue Officer with OTR and told IBRAHIM they were working on a case involving one of IBRAHIM's clients. CHS1 requested to meet with IBRAHIM for the purpose of attempting to better understand what the taxpayer previously described to CHS1 as a deal facilitated by IBRAHIM with a former OTR official to resolve the client's tax liability with OTR. During the conversation, CHS1 and IBRAHIM arranged to meet at MASALA ART, 1101 4th Street SW, Washington, DC 20024, on Thursday, July 19, 2018 at 11:30 AM.

---

[1] An Offer in Compromise (OIC) is an agreement between the taxpayer and OTR that allows the taxpayer to settle their tax debt for less than the full amount owed. According to Form OTR-10 Instructions (Rev. 3/99): Instructions for Submitting Offers in Compromise, OTR may legally compromise a tax liability owed based only on: (1) Collectability – doubt that OTR can collect the full amount owed; and/or (2) Liability – doubt whether the taxpayer owes the tax.

[2] Telephone number 240-383-7992 is a phone number known to investigators to be utilized by IBRAHIM. IBRAHIM has told investigators on numerous occasions that the number is his own and has previously spoken to investigators utilizing the number. Additionally, subscriber information for 240-383-7992 obtained from T-Mobile revealed the number is assigned to "IBRAHIM CONSULTING SERVICE."

12.     On July 19, 2018, CHS1 had a consensually monitored meeting with IBRAHIM at

MASALA ART, 1101 4th Street SW, Washington, DC 20024. The lunch bill was paid for by

IBRAHIM. The following is a conversation that occurred between CHS1 (CHS) and IBRAHIM

(ZI) during the meeting:

> ZI: You are new?
> CHS: I'm sorry?
> ZI: You are new?
> CHS: New?
> ZI: Yeah.
> CHS: 20 years almost.
> ZI: I never seen you.
> CHS: I'm in my office most of the time, or I'm in the field.
> ZI: What, what we can do together. What are you able?
> CHS: I'm a Revenue Officer and I work with taxpayers like you represent.
> ZI: So what do you do with the interest and penalty? You waive it or you don't waive it?
> Is the client going to?
> CHS: If the client wants to waive it, we have to show reasonable cause. Give me a
> reason, you know. I have to um, you know, I have the ability to um, do that. You know?
> ZI: You can respond in how long?
> CHS: I'm sorry?
> ZI: You can respond in how long?
> CHS: Umm, well… respond to what? The taxpayer?
> ZI: To me. Like right now, I working this case.
> CHS: Uh huh.
> ZI: How long?
> CHS: Take to work it?
> ZI: Yeah, to do this for me?
> CHS: Uh. I would say, normally, a week. Two. Sometimes longer. It depends. It depends
> on how hard I push it. You know what I'm saying? You understand what I'm saying
> right? So.
> ZI: I used to have Bobby Tucker [a former OTR employee].
> CHS: Cause I have a lot of cases, and uh, I don't just be in the office, but I'm also out in
> the field too. So, um, I been, I'm good at what I do.
> ZI: You do, you get me the people in the field, I convince them, a thousand to you.
> CHS: Yeah, I'm in the field too.

13.     On July 23, 2018, CHS1 conducted a consensually monitored telephone call with

IBRAHIM, utilizing 240-383-7992. During the conversation, CHS1 and IBRAHIM arranged to

meet at Z BURGER, 1101 4th Street SW, Washington, DC 20024, on Thursday, July 23, 2018 at

2:30 PM.   The following exchange occurred between CHS1 and IBRAHIM (ZI) during the conversation, prior to arranging the meeting:

> ZI: Yeah, uh, I know, I have one case here, which I can give it to you. It's a small case, and it's really, I have all the documents. It's a hard, uh, financial, and the whole amount is $6,000. He want to waive half of it, so I make him an offer, and I will see what it look like, if you want to review this case, I will.
> CHS: How much is it for?
> ZI: How much is it for?
> CHS: You said it was what, $6,000?
> ZI: Yeah, it is $6,000, include the late fee and all of that. I have that file, and about to finish it, uh, and just uh, I got all the account to show the hard financial he went through that three years, and we will see if they will waive that money for him, but I would like to sit with you to, for future job, because I don't take this kind of job anymore, but if you can assist me, I will. And also.
> CHS: Okay, well, go ahead, I'm sorry.
> ZI: Uh, also, sometime you have a list for people in the street who have a situation, I can go and talk to them to comply with the law, and to see how we can to, before you shut them down, or before they have any violation, how we can just friendly tell them, you know, we can assist to you, you are about to have a problem, because you have debt. We are here to assist to you. You can come up with some offer, we can offer it to the tax office, and that what I can do. You know?
> CHS: Uh huh.
> ZI: So at least you can tell me, that's why I want to sit with you and talk, to show you how I work, and if you like to assist, it's good for both of us.
> CHS: Oh, oh, it'll be good for the both of us?
> ZI: Uh, if this is something, you know.

14.     CHS1 understood IBRAHIM to mean that if CHS1 would provide IBRAHIM with the names of individuals with tax liabilities to OTR ("people in the street who have a situation"), then IBRAHIM would solicit their business and then would pay CHS1 to erase their tax liabilities ("if you like to assist, it's good for both of us").

15.     The following is an iMessage conversation occurring between CHS1 and IBRAHIM (ZI) utilizing 240-383-7992 on July 23, 2018, immediately after the meeting at Z BURGER:

> ZI: 26-2160699
> ZI: The name is Mazzaferro Design-Build Services
> ZI: Can you talk

CHS: I'll check it out can't talk at office
ZI: K

16.    The following is an iMessage conversation occurring between CHS1 and

IBRAHIM (ZI) utilizing 240-383-7992 on July 24, 2018:

CHS: Found a client for you. Owes $175k. I gave their accountant your number. He's going to call you. Name is Chris.
CHS: Also, looked into account for Mate LLC. Can't do much legitimately, but looks like I can fake some credits in the system and get it down to $40k. You want me to do it? Can get it turned around by end of week. And how much $ do I get for this?
ZI: I just love you
ZI: I will wait for them to call me and to my client I will talk to her today and let you know
ZI: You going to fix one account
CHS: I can fix Mate, yeah. Down to $40k. Haven't looked at the other one yet. I will. How much will I get for Mate, cause this is a lot?
ZI: How much it's as today
ZI: So I know the different
CHS: It's at $191k or so
ZI: And what about the other tax no I send yesterday It's not bug but the guy need help and he's ready.
ZI: Cool
CHS: I'll pull it up now and see what options are. What you want me to do with it? Wipe out the full $6k?
CHS: It's at about $7k now
ZI: Plz
ZI: We can have 1000 today or tomorrow the most
CHS: $1k for me to fix Mate?
ZI: No
ZI: This guy with the 6000
CHS: That one will take longer, but looks like we can get something done for him next week. I can do Mate right now though.
ZI: She's out of the country but she say yes plz Once she's back she will give me the money I trust her do
ZI: Good ppl
CHS: How much will I get? Can I get something small up front? Got bills.
ZI: Let's talk better plz
CHS: Give me a second to step out from my desk so I can call you.
ZI: K

17.    CHS1 understood IBRAHIM to mean that he would pay CHS1 in exchange for

"fak[ing] some credits in the system" to reduce the tax liability of IBRAHIM's client Mate LLC.

CHS1 further understood IBRAHIM to mean that he would pay CHS1 $1,000 in exchange for

CHS1 providing the same service for IBRAHIM's other client Mazzaferro Design-Build Services.

18.     On July 24, 2018, CHS1 conducted a consensually monitored telephone call with

IBRAHIM, utilizing 240-383-7992. The following are exchanges that occurred between CHS1

and IBRAHIM (ZI) during the conversation:

Exchange #1
CHS: Two things I need to ask you up front, okay? Is, how much in total, and how much, you know, cause I need to, you know, this is something on the side I'm doing, you know.
ZI: No, no, no, no, no, no. I have no problem with that. I have no problem. I just felt like the tax office.
CHS: Right, I just need to know from you how much.
ZI: She, uh, whatever, I talk to her, I told her, because she's overseas, I spoke with her with WhatsApp, with whatever us texting.
CHS: Okay.
ZI: So, I tell her, you know, I have a good uh news to you, so she answers, she say what, I tell her we can do this, she said, that's nice. I tell her well, you know, we make to get pay. She say, uh, when I come back. I tell her well.
CHS: Uh huh
ZI: Okay, I'm going to wait, but when you tell me you want to finish it now, I texted her, so I texted her again, and I'm looking for answer to know if she can come up with some cash, um, anybody from the restaurant, because she have two restaurant, I say no.

Exchange #2
CHS: Let me ask you this, okay? How much are we talking for me to, you know, do what you asking me to do? On yesterday. How much? How much? Talk to me in terms of dollars and cents. How much are we talking here? Because, if at, if at all possible, could you give me something today? To get started?
ZI: Today?
CHS: Yeah, you know, something to get started.
ZI: No, I don't know if I can. If you can give me a minute just to get a call from her, I will.
CHS: Uh huh. Okay, that's cool.
ZI: And also, I, hold on. If these people, they call, you say the accountant is going to call me, do you think he's going to call me today?
CHS: Well, um, he told me he would before the end of the, end of the week. Right?
ZI: Yeah, okay. No, I'm saying, if he call me today and I get any money, I can give you it and my part, I don't care.
CHS: Oh okay.
ZI: Just to show you.
CHS: So if you're able to get some money, you can give me something in good faith?
ZI: Yeah. Just, I, this is something, we're going to work together, I want to build trust.

8

CHS: Oh, okay.
ZI: So, I don't want to give you money from out of my.

Exchange #3
ZI: You know, you make me happy. You make me very happy to the point, my wife, she was next to me, she say what is going on, I tell her, I'm getting back to my old job. No headache. She say what? I tell her, you will know. Just don't talk, you will know.

Exchange #4
CHS: I'm going to go ahead and do my part, I just need you to do your part, and I just need you to tell me, you know, to kinda let me know how much, you know, how much I'm going to get out of it...
ZI: No problem.  No problem.

19.    The following is an iMessage conversation occurring between CHS1 and

IBRAHIM (ZI) on July 25, 2018:

CHS: You have $
ZI: I have some out of my account to show trust
ZI: If you can finish the 6000 guy you can have my part too
ZI: One more thing can you call me?
ZI: I do have to go plz
ZI: Can you look this up and call me
CHS: I will take care of that tomorrow. Meet me at All About Burger tomorrow 3 pm. Have $.... thanks
ZI: Do you have the new info
ZI: Also the guy for the 60000 ready tomorrow if you can clear it
ZI: This last two are ready
ZI: Look them up and call me after work if you can plz

20.    On July 30, 2018, CHS2 spoke telephonically and by text message with

IBRAHIM. CHS2 introduced themselves to IBRAHIM and told IBRAHIM they had recently

received a Notice of Enforcement Action in the mail from OTR.[3] IBRAHIM requested CHS2

send him a text message with a photograph of the letter.

---

[3] CHS2 did not in fact receive a Notice of Enforcement Action in the mail from OTR. The letter was created by investigators so CHS2 could purport to have an outstanding tax liability with OTR of $170,997.98. The letter detailed the total tax due, a demand for payment, and a statement

21.     CHS2 sent IBRAHIM a photograph of the letter via text message. In response,

IBRAHIM sent CHS2 a photograph of what appeared to be a business card. The card was for

"IBRAHIM CONSULTING FIRM" and included the address 1050 Connecticut Ave Suite #500,

Washington, DC 20009, cell phone number 240-383-7992, and office phone number 202-772-

1039.

22.     On July 31, 2018, IBRAHIM sent an iMessage to CHS1, utilizing 202-383-7992.

The iMessage was the same photograph of the Notice of Enforcement Action that was previously

sent to IBRAHIM by CHS2. The following is an iMessage conversation that ensued between

CHS1 and IBRAHIM (ZI) utilizing 240-383-7992 on July 31, 2018, immediately after CHS1

received the photograph:

> CHS: Referral
> ZI: Accounting
> ZI: I work with
> ZI: Clint ready
> ZI: Also I can meet for lunch today to talk about all this cases $
> CHS: 2:30 All About Burger
> ZI: Plz have some info about what I did send you Also if you need more info let me know
> I am at my office
> ZI: I finish and ready if you like to meet early
> CHS: On my way
> ZI: Coming out of Dcra
> CHS: Ok

23.     On July 31, 2018, CHS1 had a consensually monitored meeting with IBRAHIM at

ALL ABOUT BURGER, 1101 4th Street SW, Washington, DC 20024. During the meeting,

IBRAHIM paid CHS1 $1,000 in cash. The following are exchanges that occurred between CHS1

(CHS) and IBRAHIM (ZI) during the meeting:

Exchange #1

---

concerning various actions that could be taken against the business, to include filing a lien,
seizing assets, and referring the account to collections.

ZI: This is your client. I am going to see how much I take. Will you take the thousand from me yet?
CHS: Yeah, yeah.
ZI: All right.
CHS: Now. Ok. This is. This is.
ZI: Do you know how long this money?
CHS: No. This is.
ZI: Since you tell me give me any money. I said oh I can get you money.
CHS: Ok.
ZI: A thousand. Ok.
CHS: So this is for. Ok, let's understand. Ok, this is for the referral for this one.
ZI: I'm I am giving you this person.
CHS: Ok.

Exchange #2
CHS: Like I said. I'm going to put a hold on it for you. Do what you do, and you just, you know, just pay me for that. So, and you work it out, you know, if he give you, say, $20,000, you tell me, okay.
ZI: I'm pushing for that. I'm pushing to get the $20,000. I didn't push him like that. Yesterday I took the letter and I tell him listen, in order for us to deal with the tax office now, if you offer big money, you get the best deal. He tell me, how much? I tell him twenty, thirty, we can work together and be happy.
CHS: Right, thirty five, thirty, something like that.
ZI: I'm just trying to shake him up, because I don't want him to come and say, get me out of this trouble for $5,000.

Exchange #3
CHS: This is $170,000 okay? You work it out with him. Today, I put a stop on it, so nobody going to bother it, or whatever. You know, just give me a little change for that, and you work with them, and do the best you can.
ZI: I will get you good money from this.

Exchange #4
ZI: We are about to cash out of this guy. The way how he talk to me yesterday. Yes. He talk to me yesterday and then I inform him about the thirty, twenty, thirty. He back up a little bit, but I tell him, listen, you going to have a lot of problems. Just give me the cash.

Exchange #5
CHS: And you got something for me?
ZI: I just gave you $1,000 out of my pocket.

Exchange #6
ZI: If I give you five address, you make a threat, they will call me.

Exchange #7
ZI: If you see somebody to scare, wait for a minute, you will get money out of me.

Exchange #8
CHS: Did he make a lot of money though, doing that?
ZI: Bobby. We had a good run one time. We had a good. We had one year. One year was good one, when we make $25,000 a month.
CHS: You said $25,000?
ZI: Yeah.
CHS: Oh, hey, that's a good run.

Exchange #9
ZI: Bobby Tucker. Bobby Tucker, you don't, like, you see. I know the law. I know how people can get in trouble, especially with the government, because I did work with the government.
CHS: Cause I don't want to go to jail, or nothing. I don't want to lose my job.
ZI: No, so, you see, so, how I explain to Bobby Tucker, because he was close to me, I told Bobby Tucker, for us, all the money between you, we brothers. Government cannot tell us now. Oh this money? This money is a gift. That money, that money I have something with you. Has nothing to do, since there is no documents. So the account I'm going to give you and the report and all of it. So now, I tell to Bobby Tucker, listen, Bobby Tucker going to trust me, or you don't trust me. Okay. We talk about case. You ever see a case, give it to me. Some other time come get the money, or take the money and then give me the case, don't do the case and the money together, because that's the whole thing together. But in fact now, if I give you money, no document, you can say, of this guy borrowed money from me or something. This guy is this, I know him.

Exchange #10
ZI: They. Yes. They, so over the years, they have like four, five thousand dollars tax. Bobby Tucker, last year, he says, I'm going to waive it, give me $2,000.

Exchange #11
CHS: Let me ask you this. Okay. This just between me and you Mr. Zak. Okay? Now, you know, I don't want to get in trouble. I don't want you to get in trouble or whatever like that, and so, we just keep this between us.
ZI: That's what I wanted to do. You want to eat. I want to eat.

24.     Your affiant believes that in these exchanges, Ibrahim offered to bribe CHS1 to fix the tax liability of CHS2 ("I will get you good money from this.  We will cash out of this guy." "You want to eat.  I want to eat.")  Your affiant further believes that, in Exchange #10, Ibrahim admitted to CHS1 that he had previously bribed a former OTR official named Bobby Tucker ("I'm going to waive it, give me $2,000.")  Your affiant further believes that Ibrahim's effort to arrange

12

a cover story with CHS1 (in Exchange #9) and his agreement (in Exchange #11) to "just keep this between us" shows that Ibrahim was aware of the corrupt nature of his agreement with James.

25.     On July 31, 2018, CHS2 conducted a consensually monitored telephone call with IBRAHIM, utilizing 240-383-7992. During the conversation, CHS2 and IBRAHIM arranged to meet at CHS2's business in the District of Columbia on August 1, 2018 at 3:00 PM.

26.     On August 1, 2018, CHS2 had a consensually monitored meeting with IBRAHIM at CHS's business in the District of Columbia. During the meeting, CHS2 gave IBRAHIM $4,900 in cash. Additionally, during the meeting, IBRAHIM wrote a letter on a sheet of paper. IBRAHIM dated the letter 8/1/18 and signed his name at the bottom. The letter read, "I Recived the amont of 5000 in CASH . as a dopset FOR the TAX L0001974936 To hold ay Action against the business until date 8/17/18 the client promise To pay 30,000 To fixed the problem and come to payment arrangement with the TAX office."

27.     The following is an iMessage conversation that occurred between CHS1 (CHS) and IBRAHIM (ZI) during the above described meeting between IBRAHIM and CHS2:

> CHS: You get us any money? I erased all their taxes, I have the paperwork for you. I get off at 5:30 Can you meet me then?
> ZI: Can you talk
> ZI: Good news
> CHS: No got people around me…. text me please
> ZI: Where you like to meet
> ZI: Yes I have $$$
> CHS: All about burger
> ZI: K

28.     On August 1, 2018, CHS1 had a consensually monitored meeting with IBRAHIM at ALL ABOUT BURGER, 1101 4th Street SW, Washington, DC 20024. During the meeting, IBRAHIM paid CHS1 $2,500 in cash. Also during the meeting, CHS1 gave IBRAHIM a Statement of Account for CHS2's business, purporting that the business had no longer had any outstanding

District of Columbia Tax liability.[4] The following are exchanges that occurred between CHS1

(CHS) and IBRAHIM (ZI) during the meeting:

> Exchange #1
> CHS: Well, what I went ahead. What I did, okay.
> ZI: I know. You did something.
> CHS: Because, I was able to use someone else's computer. I was able to, you know, use another's computer, who had the rights that I didn't have.
> ZI: Yeah, okay.
>
> Exchange #2
> CHS: I erased it.
> ZI: So I can talk this way, cause now.
> CHS: You understand what I did though right?
> ZI: Yeah, of course. Yes.
>
> Exchange #3
> ZI: You count your take?
> CHS: No.
> ZI: This is twenty five. He give me $5,000. A lot of twenties.
> CHS: Okay.
> ZI: That's why I got for you. I went the bank, and just save the, yeah.
> CHS: Okay. So this, so this $2,500 if for wiping out? Well, let's just say it. Eliminating, eliminating the liability, right?
> ZI: This $5,000. To him, I tell to him, this is for my office to help with the two weeks until you come up with the $30,000.
> CHS: Okay. So he's going to come up with thirty?
> ZI: You didn't read it?
> CHS: I read it. I'm, I'm just, I'm.
> ZI: So why you keep asking me?
> CHS: Because I didn't read all of it, I just skim through it.
> ZI: He give me five. He's going to give me twenty five in a minute. I may not want to give him this. I don't want to give him this.
> CHS: No, not until we get paid.
> ZI: Yeah, that's right. I want to give him something tomorrow. I'm going to tell him, I can hide this. I tell him. That's what you're going to get. But thirty is not good. No, get me a hundred.
> CHS: How much you think we can get?
> ZI: No, get me a hundred. This case? You get me, you let, let me just work, please.

---

[4] The Statement of Account was created by investigators so CHS1 could purport to have erased the business's $170,997.98 tax liability with OTR. The letter read, in part, "the above names individual or entity has no outstanding District of Columbia Tax liability."

CHS: Okay. You tell me what you need.

ZI: You see, the client promise to pay $30,000 to fix the problem, and come to a payment arrangement with the tax office. Just, I'm not telling you anything, just let me sell this the right way.

CHS: You do what you do.

ZI: Yeah please. Let me sell it my way. This is very cheap and is not fair, and it's not fair, and if you do this, you're going to have a lot of clients, and you're going to end up leaving a lot of money, and not making good money.

Exchange #4

CHS: So, so in two weeks. We get seventeen? Yeah. $17,000 each?

ZI: No, we going to get five, we're going to get twelve fifty.

CHS: Right. Sorry, my mind is all over the place.

ZI: And I give you thousand out of my pocket, but this is more.

CHS: Got you, okay. That's, I understand.

Exchange #5

ZI: Let me get money. Waive the $6,000 I can get you money. Tomorrow.

CHS: Yeah. I'm working on it. Because I figured, you told me, I did this because you told me you had that meeting. You know, and I wanted you to have it.

ZI: Just don't worry. Just please, do this guy, let me get couple of dollars for you and me from him….They're not going to look. Nobody going to look until, you feel like. If you do a job like this once a month, you good.

CHS: Yeah, I mean, because it doesn't look, you know, I don't want any attention.

ZI: No, and ten thousand, fifteen thousand. It is not bad. It's not bad money.

29.     Your affiant believes that at this meeting IBRAHIM bribed CHS1 with a $2,500 payment (and the promise of an additional $12,500 payment) to erase CHS2's purported tax liability.

30.     On August 2, 2018, IBRAHIM sent a text message to CHS2. The text message was a photograph of the same Statement of Account that CHS1 gave IBRAHIM during their meeting on August 1, 2018. The Statement of Account had two yellow pieces of paper covering up the name and contact information for the business. Shortly after sending the text message, CHS2 (CHS) and IBRAHIM (ZI) had a series of consensually monitored telephone conversation. The following are exchanges from those conversations:

Exchange #1

ZI: Did you see what I sent you?

CHS: What did you send me? You didn't send me nothing.
ZI: I sent you a letter to show you.

Exchange #2
CHS: Yeah my friend, I see the letter, you sent it. But why you put the yellow paper on, to cover something?
ZI: Because I cannot show you name of people. I cannot. I just show you what we do.

Exchange #3
ZI: But do you see what she's done to the people? How do you like that?
CHS: Okay.
ZI: You understand what I say?

31.     CHS2 understood IBRAHIM to be showing CHS2 an example of the results CHSs could expect to see from IBRAHIM through IBRAHIM's contact at OTR. Your affiant believes that IBRAHIM showed CHS2 the letter with CHS2's name obscured by the yellow paper so that CHS2 would think that he still had to pay IBRAHIM an additional $25,000 before CHS2's purported tax liability would actually be erased.

## **CONCLUSION**

32.     Based on the foregoing, I respectfully submit that probable cause exists to believe that ZAKARIA IBRAHIM committed the offense of Bribery of a Public Official in violation of 18 U.S.C. § 201.  Therefore, I respectfully request that a criminal complaint and arrest warrant be issued for ZAKARIA IBRAHIM.

Respectfully submitted,

Andrew E. Waltz
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on August ___, 2018

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE